**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| Berle Manufacturing Company and Berle Enterprises, Inc., Individually And On Behalf Of Themselves and All Others Similarly Situated, | Case No.: 2:07- cv-2923 _____ |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| Southern Motor Carriers Rate Conference, Inc., AAA Cooper Transportation, Averitt Express, Inc., Estes Express Lines, Inc., FedEx National LTL, Inc., Old Dominion Freight Line, Inc., R&L Carriers, Inc., Saia Motor Freight Line, L.L.C, Southeastern Freight Lines, Inc., UPS Freight and John Does I-X, | **CLASS ACTION** **(DEMAND FOR JURY TRIAL)** |
| Defendants. | |

Plaintiffs, on behalf of themselves and all others similarly situated, bring this action against Defendants for treble damages and injunctive relief under the federal antitrust laws of the United States, Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 ("Sherman Act") and Section 4 of the Clayton Antitrust Act of 1914, 15 U.S.C. § 15 ("Clayton Act").  Plaintiffs complain and allege as follows:

**NATURE OF THE ACTION**

1.     This action arises from a conspiracy between Defendant motor carrier rate bureau and Defendant motor common carriers, individually and through their agents (collectively "Defendant Carriers" or "Carriers"), to unlawfully fix, peg, raise, maintain, and/or stabilize prices for "Fuel Surcharges" charged to shippers who purchase freight transportation services from Defendant Carriers.

1

Carriers represent that such "Fuel Surcharges" reflect the actual increased cost of fuel and are being passed along to the shippers to compensate the Carriers for the increased costs of fuel over and above a base fuel rate.  In fact, Carriers have been calculating the "Fuel Surcharge" in a manner that is deliberately designed to conceal hundreds of millions of dollars in profits under the guise of "costs."

2.      Plaintiffs, on behalf of all persons and entities who purchased freight transportation services from any of the Defendant Carriers and their co-conspirators or any predecessor, subsidiary, or affiliate of each, at any time during the four years prior to the date of filing of this action (the "Class"), bring this action to recover treble damages for violations of the aforesaid United States antitrust laws, as well as injunctive relief.

3.      At all relevant times herein, Defendants conspired to charge "Fuel Surcharges" to shippers in the United States for freight transportation.  As further alleged herein, during at least the period of four years prior to the filing of this action (the "Class Period"), Defendants agreed, combined, and conspired with each other to fix, peg, raise, maintain, and/or stabilize illegal "Fuel Surcharges."  As a result of Defendants' unlawful conduct and conspiracy, Plaintiffs and the other members of the Class paid artificially high and unlawful "Fuel Surcharges" and have been damaged thereby.

## JURISDICTION AND VENUE

4.      This Complaint is brought against Defendants under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and the costs of

this suit, including reasonable attorneys' fees, for the damages sustained by Plaintiffs and the members of the Class by reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as for injunctive relief.

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

6.      This Court has *in personam* jurisdiction over each of the Defendants, as each was engaged in an illegal price-fixing scheme and conspiracy that was directed at and/or caused damages to persons and entities residing in, located in, or doing business throughout the United States including the District of South Carolina.

7.      Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b) and (c) because during the Class Period Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of the events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in the District of South Carolina.

8.      No other forum would be more convenient for the parties and witnesses to litigate this action.

## PARTIES

9.      Plaintiff Berle Manufacturing Company is a corporation and resident of the State of South Carolina with its principal place of business in Charleston, South Carolina.

10.      Plaintiff Berle Enterprises, Inc. is a corporation and resident of the State of South Carolina with its principal place of business in Charleston, South Carolina.

11.      Plaintiffs purchased freight transportation services and paid the "Fuel Surcharge" set by the unlawful actions of all Defendants.

12.      Defendant Southern Motor Carriers Rate Conference, Inc. (SMC) is a motor carrier rate bureau incorporated under the laws of the State of Georgia with headquarters in Peachtree City, Georgia.  The collective ratemaking and related activities which comprise the functions of SMC, as described more fully below, provide the mechanism by which Defendants conspire to unlawfully fix, peg, raise, maintain and/or stabilize prices for "Fuel Surcharges."

13.      Defendant AAA Cooper Transportation is a motor carrier incorporated in the State of Alabama, with its headquarters in the State of Alabama, which provides freight transportation services to the general public.  It maintains shipping terminals in South Carolina.  It is a member of SMC.  Through its membership and participation in SMC it has unlawfully conspired with the other Defendants to fix, peg, raise, maintain and/or stabilize prices for "Fuel Surcharges."

14.     Defendant Averitt Express, Inc. is a motor carrier incorporated in the State of Tennessee, with its headquarters in the State of Tennessee, which provides freight transportation services to the general public. It maintains service centers in South Carolina.  It is a member of SMC.  Through its membership and participation in SMC it has unlawfully conspired with the other Defendants to fix, peg, raise, maintain and/or stabilize prices for "Fuel Surcharges."

15.     Defendant Estes Express Lines, Inc. is a motor carrier incorporated in the State of Virginia, with its headquarters in the State of Virginia, which provides freight transportation services to the general public.  It maintains shipping terminals in South Carolina.  It is a member of SMC.  Through its membership and participation in SMC it has unlawfully conspired with the other Defendants to fix, peg, raise, maintain and/or stabilize prices for "Fuel Surcharges."

16.     Defendant FedEx National LTL, Inc. is a motor carrier incorporated in the State of Delaware, with its headquarters in the State of Florida, which provides freight transportation services to the general public and has provided freight transportation services directly to Plaintiffs.    It maintains shipping terminals in South Carolina.  It is a member of SMC.  Through its membership and participation in SMC it has unlawfully conspired with the other Defendants to fix, peg, raise, maintain and/or stabilize prices for "Fuel Surcharges."

17.     Defendant Old Dominion Freight Line, Inc. is a motor carrier incorporated in the State of Virginia, with its headquarters in the State of North Carolina, which provides freight transportation services to the general public.  It maintains shipping terminals in South Carolina.  It is a member of SMC.  Through its membership and participation in SMC it has unlawfully conspired with the other Defendants to fix, peg, raise, maintain and/or stabilize prices for "Fuel Surcharges."

18.     Defendant R&L Carriers, Inc. is a motor carrier incorporated in the State of Ohio, with its headquarters in the State of Ohio, which provides freight transportation services to the general public.  It maintains shipping terminals in South Carolina.  It is a member of SMC.  Through its membership and participation in SMC it has unlawfully conspired with the other Defendants to fix, peg, raise, maintain and/or stabilize prices for "Fuel Surcharges."

19.     Defendant Saia Motor Freight Line, L.L.C. is a motor carrier incorporated in the State of Louisiana, with its headquarters in the State of Georgia, which provides freight transportation services to the general public.  It maintains shipping terminals in South Carolina.  It is a member of SMC.  Through its membership and participation in SMC it has unlawfully conspired with the other Defendants to fix, peg, raise, maintain and/or stabilize prices for "Fuel Surcharges."

20.     Defendant Southeastern Freight Lines, Inc. is a motor carrier incorporated in the State of South Carolina, with its headquarters in the State of South Carolina, which provides freight transportation services to the general

public and has provided freight transportation services directly to Plaintiffs.  It is a member of SMC.   Through its membership and participation in SMC it has unlawfully conspired with the other Defendants to fix, peg, raise, maintain and/or stabilize prices for "Fuel Surcharges."

21.     Defendant UPS Freight is a motor carrier incorporated in the State of Delaware, with its headquarters in the State of Virginia, which provides freight transportation services to the general public and has provided freight transportation services directly to Plaintiffs.   It maintains shipping terminals in South Carolina.   It is a member of SMC.   Through its membership and participation in SMC it has unlawfully conspired with the other Defendants to fix, peg, raise, maintain and/or stabilize prices for "Fuel Surcharges."

## UNNAMED CO-CONSPIRATORS

22.     On information and belief, at all relevant times, other carriers, trade groups, or other entities, referred to herein as John Does I-X, willingly conspired with Defendants in their unlawful restraint of trade.   All averments herein against named Defendants are also averred against these unnamed co-conspirators as though set forth at length.

## DEFENDANTS' AGENTS

23.     Each of the Defendant Carriers acted for itself or by and through its local agents, who transport freight for it and under its name.  As such, each Defendant Carrier is responsible for all acts or omissions of any of its agents which relate to the performance of freight transportation services which are within the actual or apparent authority of the agent from the Carrier or which

are ratified by the Carrier.  The acts complained of herein have been within the apparent authority of the Defendant Carriers, have been to their benefit, and have been ratified by Defendant Carriers.

## CLASS ACTION ALLEGATIONS

24.     Plaintiffs bring this action on their own behalf and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Class:

> All individuals or entities (excluding governmental entities, Defendants, and Defendants' parents, predecessors, subsidiaries, affiliates, agents and Defendants' co-conspirators) who purchased freight transportation services for shipments directly from any of the Defendants, Defendants' co-conspirators, or Defendants' predecessors, subsidiaries, affiliates or agents, at any time during the period within four years prior to the filing of this action.

25.     Because such information is in the exclusive control of Defendants, Plaintiffs do not know the exact number of Class members.  Due to the nature of the trade and commerce involved, however, Plaintiffs believe that Class members number at least in the thousands and are sufficiently numerous and so geographically dispersed throughout the United States that joinder of all Class members is impracticable.

26.     There are questions of law or fact common to the Class, including:

> a.     Whether Defendants engaged in a combination or conspiracy among themselves to unlawfully fix, peg, raise, maintain, and/or stabilize Fuel Surcharge prices charged for freight charges within the United States;
>
> b.     The duration of the conspiracy alleged in this Complaint, and the nature and character of

the acts performed by Defendants in furtherance of the conspiracy;

c.      Whether the alleged conspiracy violated Section 1 of the Sherman Act;

d.      Whether the Fuel Surcharge agreed to and implemented by Defendants was unlawful;

e.      The effect of Defendants' conspiracy on the Fuel Surcharge prices charged for freight transportation within the United States during the Class Period;

f.      Whether the conduct of Defendants, as alleged in this Complaint, caused damages to the Plaintiffs and the other members of the Class; and

g.      The appropriate measure of damages sustained by Plaintiffs and other members of the Class.

27.     Each Plaintiff is a member of the Class.  Each Plaintiff's claims are typical of the claims of the Class members.  Each Plaintiff will fairly and adequately protect the interests of the Class.  Each Plaintiff paid "Fuel Surcharges" directly to one or more Defendants, and its interests are coincident with and not antagonistic to those of other members of the Class.  Plaintiffs are represented by counsel competent and experienced in the prosecution of complex litigation, including class action litigation.

28.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

29.     A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in

a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment is necessary to permit adjudication of claims by many Class members who otherwise could not justify the considerable expense to litigate an antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties in management that would preclude maintenance as a class action.  Finally, the Class is readily definable and is one for which records of the names and addresses of the members of the Class exist in the files of Defendants.

## INTERSTATE TRADE AND COMMERCE

30.    The national market for freight shipping by commercial truckers is a multi-billion dollar industry.

31.    Throughout the Class Period, there was a continuous and uninterrupted flow of transactions by Defendants in interstate commerce throughout the United States.

32.    Defendants' unlawful activities, as described herein, took place within the flow of interstate commerce between Defendants and Plaintiff class members who were located in states other than the states in which Defendants are located, and had a direct, substantial, and reasonably foreseeable effect upon interstate commerce.

## DEFENDANT CARRIERS AND THE FREIGHT TRANSPORTATION MARKET

33.    The Defendant Carriers are each other's principal competitors in the national commercial trucking freight transportation market.

34.     Freight transportation services are fungible in the sense transportation services provided by any one carrier are readily substitutable for the transportation services provided by any other carrier.  Such services are a nondurable product for which demand is inelastic.

35.     The Defendant Carriers sell freight transportation services to shippers, including Plaintiffs and the members of the Class who are direct purchasers thereof.

## THE STATUTORY SCHEME GOVERNING INTERSTATE TRUCKING FREIGHT TRANSPORTATION

36.     Transportation of freight by the trucking industry is regulated by Title 49 U.S.C. Subtitle IV Part B Chapter 137 and Chapter 147.

37.     Carriers may collectively agree in a restricted number of circumstances to fix and adjust rates without being in violation of United States antitrust laws when they act pursuant to an agreement submitted to and approved by the Surface Transportation Board (STB) as being in the public interest. Any other concerted action has no antitrust immunity and violates the Sherman and/or Clayton Acts. The agreements that are eligible for the antitrust exemption are set forth in 49 U.S.C. § 13703 as follows:

> 13703. Certain collective activities; exemption from antitrust laws
>
> (a) Agreements. —
>         (1) Authority to enter. — A motor carrier providing transportation or service subject to jurisdiction under chapter 135 may enter into an agreement with one or more such carriers to establish —
>                 (A) through routes and joint rates;

(B) rates for the transportation of household goods;

(C) classifications;

(D) mileage guides;

(E) rules;

(F) divisions;

(G) **rate adjustments of general application** *based on industry average carrier costs* (so long as there is no discussion of individual markets or particular single-line rates); or

(H) procedures for joint consideration, initiation, or establishment of matters described in subparagraphs (A) through (G).

(Emphasis added).

## THE NATURE OF THE UNLAWFUL CONSPIRACY

38.     Defendant SMC maintains a forum for the joint consideration and approval by its motor carrier members of changes in freight rates and charges and related pricing elements, together with the rules, regulations, and practices pertaining thereto; to compile, publish, and file tariffs; and to investigate, procure, analyze, compile, publish and disseminate statistics, reports, and general information. (Exhibit 1, SMC By-Laws, p.3 Art. 5).

39.     A motor common carrier becomes a member of SMC by "executing an agreement to abide by the Charter, the By-laws, and Rules of Procedure of SMC…and, if participating in SMC tariffs, upon the execution of proper Power of Attorney, and upon executing a Rate and Tariff Agreement…."

40.     SMC maintains a General Rate Committee (GRC). The Committee "uses its collective ratemaking authority to evaluate the need for carrier rate increases…."

41.     Each member carrier has a representative on the GRC.

42.    "Member carrier representatives attend the meeting to consider these findings and voice their thoughts and needs in relation to general ratemaking issues….All dockets for rate increases, decreases or restructures are the product of a member carrier's motion that is approved by the GRC.  **What's more, the rate actions taken by GRC member carriers, must, by law, accurately reflect industry average carrier costs**." (Exhibit 2, SMC 2007 General Rate Increase: Benchmark Pricing for a Proactive LTL Marketplace, p. 1-2) (Emphasis added).

43.    The requirement that rate actions taken by GRC member carriers accurately reflect industry average carrier costs is also recognized in §IV 4.6(3)(a) and (b) of the Procedure of SMC.  (Exhibit 3, SMC Procedure, p. 18-20).

44.    Defendant Carriers through and by way of their membership in SMC have conspired to fix, peg, raise, and maintain illegal Fuel Surcharges.

45.    Defendant SMC copyrights and periodically issues to its participating members a "Fuel Surcharge Supplement."  (Exhibit 4, Supplement 1 to Tariff SMC 190-AB).

46.    In Defendants' tariffs the base cost of shipment, which is a result of differential pricing based on factors such as weight, mileage, place of origin, and destination, is referred to as the "linehaul charge."

47.    SMC's "Fuel Surcharge Supplement" states any individual linehaul charge "will be further subject to the surcharge provided herein."

48.     The Supplement contains a table by which an additional percentage is imposed on the price charged the shipper based upon (but not reflecting) increases in the price of diesel fuel as announced by the United States Department of Energy (DOE).

49.     Defendant SMC circulates to all its members a weekly bulletin setting forth the change in fuel prices, as announced by DOE, to be followed by Defendant Carriers in adjusting the Fuel Surcharge percentage to be charged.  (Exhibit 5, SMC Weekly Information Bulletin, August 10, 2007, p. 35-36).

50.     The Defendants by this device agreed to fix, peg, raise, and maintain "Fuel Surcharges" determined as a percentage of the linehaul charge. Fuel surcharges calculated by this formula with the specified percentages vastly exceed the increase in average fuel costs actually incurred by the industry and the Fuel Surcharges that would prevail in a competitive market.   But for the illegal agreement, Plaintiff class members would have paid less for the freight transportation services they purchased from Defendant carriers.

51.     Defendants knowingly engaged in price fixing, a per se violation of the antitrust laws, as well as an unreasonable agreement in restraint of trade, by conspiring to calculate Fuel Surcharges imposed on their customers in the aforesaid way.

52.     Defendant Carriers have market power in the relevant market.

53.     The motor freight carrier industry is characterized by slim profit margins.   Defendants are motivated to combine and conspire by the necessity of decreasing their operating ratios to a level that continues to insure the viability of continued individual operations.   The operating ratio is the ratio of expenses to revenue before interest and taxes.   SMC publications state that "an operating ratio of 93% is adequate to provide the needed return on investment for a motor carrier to remain in business for the foreseeable future, while an operating ratio of 97% or higher inhibits the carrier from reinvesting in the business."   (Exhibit 6, SMC 2005 General Rate Increase: Economic Stability in LTL Pricing, p. 2; Exhibit 7, SMC 2004 General Rate Increase: The Dynamics of Cost, p. 1).   One of the methods by which Defendant carriers can achieve the highest operating performance is by agreement to charge "optimal fuel surcharge recovery."

54.     Defendant Carriers are members of SMC and dispatch representatives to meetings conducted by SMC wherein costs and prices can be readily discussed.   Defendants have met at the following times and locations:

- 46th Annual Summer meeting June 20-22, 2001 Orlando, FL;
- 47th Annual Winter meeting January 28-29, 2002 Atlanta, GA;
- 47th Annual Summer meeting June 19-21, 2002 Branson, MO ;
- 48th Annual Winter meeting January 21-22, 2003 Atlanta, GA;
- 48th Annual Summer meeting June 18-20, 2003 St. Petersburg, FL;
- 49th Annual Winter meeting January 20-21, 2004 Atlanta, GA;
- 49th Annual Summer meeting June 16-18, 2004 Williamsburg, VA;
- 50th Annual Winter meeting January 25-26, 2005 Atlanta, GA;
- 50th Annual Summer meeting June 22-24, 2005 Savannah, GA;
- 51st Annual Winter meeting January 24-25, 2006 Atlanta, GA;
- 51st Annual Summer meeting June 14-16, 2006 San Antonio, TX;
- 52nd Annual Winter meeting January 23-24, 2007 Atlanta, GA; and
- 52nd Annual Summer meeting June 20-22, 2007 Myrtle Beach, SC.

55.    Meetings of the SMC General Rate Committee are conducted even more frequently.

56.    Defendant Carriers utilize the same charging software and maintain websites whereby Defendants communicate immediate and accurate information as to Fuel Surcharges being charged by the various Defendants.

57.    In 2003, Defendant Carriers departed from their normal business practice of incorporating fuel increases into their basic linehaul costs and began to charge identical or nearly identical percentages denominated Fuel Surcharges" purportedly to recover the increase in fuel costs but in actuality creating for each Defendant a new profit center.

58.    The forebearance of Defendant Carriers to charge less than the uniform inflated Fuel Surcharges and thus surrender a competitive advantage and larger market share is not in their economic interest and can only be plausibly explained by an agreement to charge identical or nearly identical rates, militating against any possibility Defendants have acted independently or for any legitimate business purpose.

59.    Defendants deliberately and knowingly adjusted their rates in a manner calculated to disguise profits as rate adjustments that were not reflective of rising "industry average carrier costs" for diesel fuel.  In so doing, Defendants did not collectively make "rate adjustments of general application based on industry average carrier costs," as specified in 49 U.S.C. § 13703(a)(1)(G).  Neither did such practice comply with or "carr[y] out under its terms," 49 U.S.C. § 13703(a)(6), the SMC Agreement that specifically cites and

incorporates the requisite standard of "industry average carrier costs." Therefore, Defendants' conduct is not exempt from federal antitrust laws.

60.     Defendants jointly and collectively, in South Carolina and throughout the United States, profited from these unlawful rate adjustments designated as "Fuel Surcharges" in amounts totaling hundreds of millions of dollars, representing the difference between the actual cost attributable to the increase in their cost of fuel and the amounts they have unlawfully charged shippers.

61.     The STB recently decided to terminate the antitrust immunity of all motor carrier rate bureaus, including Defendant SMC.  STB Ex Parte No. 656, Motor Carrier Bureaus – Periodic Review Proceeding, decision served May 7, 2007, corrected decision served May 15, 2007 (2007 WL 1437361 (STB) May 15, 2007) (Exhibit 8).  The STB discussed the history of rate bureau operations and noted that the United States Department of Justice and United States Department of Transportation had filed comments with the STB calling for termination of antitrust immunity.  The STB concluded that:

> Continued antitrust immunity for collective rate-related activities can only hinder the full operation of the competitive forces unleashed by deregulation – forces that should induce firms to operate more efficiently and pass savings on to customers.

(Exhibit 8, at 12).  The STB went on to state:  "It is not in the public interest to protect a collective rate-setting system that does not reflect recognized cost factors."  (Exhibit 8, at 21).

## ANTI-TRUST VIOLATIONS

62.     Plaintiffs incorporate by reference, as if fully set forth herein,

the allegations contained in the preceding paragraphs of the Complaint.

63.     During the Class Period, being four years prior to the filing hereof, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially and unlawfully raise, peg, fix, maintain, and/or stabilize "Fuel Surcharge" prices in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

64.     In formulating and effectuating the alleged contract, combination, or conspiracy, Defendants engaged in anti-competitive activities, the purpose and effect of which was to artificially raise, fix, peg, maintain, and/or stabilize "Fuel Surcharges."  These activities included the following:

    a.     agreeing to charge "Fuel Surcharges" at certain levels and otherwise to fix, raise, peg, maintain, and/or stabilize the "Fuel Surcharges" charged within the United States; and

    b.     charging "Fuel Surcharges" in reliance on methodology and formula promulgated and agreed upon by Defendants.

65.     During the Class Period, Defendants increased, as a ratio to external costs – and profits – the "Fuel Surcharges" they charged.  These relative increases in "Fuel Surcharges" cannot be explained by, nor do they accurately reflect, the actual increase in industry average carrier cost of fuel, but rather were the result of anticompetitive conduct.

66.     During the Class Period, Plaintiffs and members of the Class paid "Fuel Surcharges" directly to Defendant Carriers, their agents, subsidiaries, and their controlled affiliates.

67.    The illegal combination and conspiracy alleged herein has had the following effects, among others:

a.    price competition in the charging of "Fuel Surcharges" has been restrained, suppressed, and/or eliminated;

b.    price competition in the contracting of freight transportation services has been restrained, suppressed, and/or eliminated;

c.    "Fuel Surcharges" charged by Defendants have been fixed, raised, maintained, and/or stabilized at artificially high, non-competitive levels; and

d.    Members of the Class have been deprived of the benefit of free and open competition.

68.    During the Class Period, Plaintiffs and the members of the Class, as a direct and proximate result of Defendants' antitrust violations, paid excessive "Fuel Surcharges" and total transportation charges they would not have paid absent such violations.  Plaintiffs and the members of the Class, therefore, have been injured and financially damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

## **PRAYER FOR RELIEF**

69.    **WHEREFORE**, Plaintiffs pray that:

a.    The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

b.      The Court certify the Class as follows:  All individuals or entities (excluding governmental entities, Defendants, and Defendants' parents, predecessors, subsidiaries, affiliates, agents and Defendants' co-conspirators) who purchased freight transportation services for shipments directly from any of the Defendants, Defendants' co-conspirators, or Defendants' predecessors, subsidiaries, affiliates or agents, at any time during the period within four years prior to the filing of this action.

c.      The Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

d.      Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and the Class for damages as allowed by law in an amount determined to have been sustained by them;

e.      The Court award Plaintiffs and the Class attorneys' fees and costs, and pre-judgment and post-judgment interest as permitted by law;

f.      The Court enjoin and restrain Defendants from engaging in any such agreement and price-fixing in the future, and

g.      Award Plaintiffs and the Class such other further relief as may be necessary and appropriate.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

**MARK C. TANENBAUM, P.A.**

By:     s/Mark C. Tanenbaum
       **MARK C.  TANENBAUM, Fed ID # 4017**
       mark@tanenbaumlaw.com
       **JOHN P. ALGAR, Fed ID # 540**
       john@tanebaumlaw.com
       **MIA LAUREN MANESS, Fed ID # 5457**
       mia@tanenbaumlaw.com
       241-243 East Bay Street
       Post Office Box 20757
       Charleston, SC   29413-0757
       Telephone: (843) 577-5100
       Facsimile:  (843) 722-4688

       and

       RICHARDSON PATRICK WESTBROOK
       & BRICKMAN, LLC

By:     s/A. Hoyt Rowell, III
       **A. HOYT ROWELL, III, Fed. ID # 3665**
       hrowell@rpwb.com
       **ROBERT S. WOOD, Fed. ID # 7965**
       bwood@rpwb.com
       **T. CHRISTOPHER TUCK, Fed. ID # 9135**
       ctuck@rpwb.com
       **DAN O. MYERS, Fed. ID # 9884**
       dmyers@rpwb.com
       1037 Chuck Dawley Blvd, Bldg. A  (29468)
       Post Office Box 1007
       Mt. Pleasant, SC   29465
       Telephone: (843) 727-6500
       Facsimile:  (843) 216-9509

       ATTORNEYS FOR PLAINTIFFS

August 23, 2007

F:\mct\LTL\Pleadings\Complaint.doc-8/23/2007 5:12 PM