## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

IN RE: LTL SHIPPING SERVICES
ANTITRUST LITIGATION

This Order Relates To:

ALL ACTIONS

1:08-MD-01895-WSD

## OPINION AND ORDER

This is a consolidated multi-district litigation class action brought against freight transportation carriers.  The Plaintiffs, all purchasers of the Defendants' freight services, allege that the Defendants fixed prices for fuel surcharges on less-than-truckload freight shipments, in violation of Section 1 of the Sherman Act. The matter is before the Court on the Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint [246] and on the Defendants' request for judicial notice.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On January 4, 2008, the Judicial Panel on Multidistrict Litigation transferred to this Court a number of private actions filed in various courts across the country

challenging, as anticompetitive, the fuel surcharges assessed by freight carriers engaged in less-than-truckload ("LTL") freight transportation.  Fifty-one (51) cases have been consolidated into this multi-district action.

On April 15, 2008, the Court held a pretrial conference, at which it considered the Plaintiffs' Motion to Appoint Co-Lead Counsel [161].  Plaintiffs informed the Court that they expected to be able to file a consolidated amended complaint against all Defendants in which the Plaintiffs would allege only federal antitrust claims.[1]  On April 17, 2008, the Court appointed Plaintiffs' Co-Lead Counsel and the Defendants' Liaison Counsel.

On April 22, 2008, the Court ordered the Plaintiffs to file a consolidated amended complaint on behalf of all participating Plaintiffs.  The Court provided a framework by which the Defendants could file a consolidated motion to dismiss the Plaintiffs' amended complaint [224].

---

[1]  Several of the individual actions made part of this multidistrict case alleged state law claims which paralleled or overlapped the federal antitrust claims.

On May 23, 2008, the Plaintiffs filed their Consolidated Amended Class Action Complaint For Violation of the Sherman Act [237].  The allegations of the Consolidated Amended Complaint are described below.[2]

Plaintiffs bring this suit on behalf of a class of persons and entities (the "Class") which purchased LTL freight transportation services from the Defendants from July 31, 2003 to the present (the "Class Period") and were assessed a fuel surcharge by the Defendants.[3]  Defendants are a collection of freight transportation companies which, collectively, provide more than 75% of the United States market for LTL freight transportation services.  Am. Compl. ¶ 49.[4]

_____

[2] In ruling on a motion to dismiss, the Court is required to accept the Plaintiffs' factual allegations as true, Hishon v. King & Spalding, 467 U.S. 69, 73 (1984), and considers the allegations in the complaint in the light most favorable to the Plaintiffs.  Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007).

[3] The representative Plaintiffs named in the Amended Complaint are Acushnet Rubber Company, Inc. d/b/a Precix, Alum-A-Lift, Inc., Berle Manufacturing Co., Inc., Brewton Enterprises, Inc., Dad's Products Company, Inc., Farm Water Technological Services, Inc., Global Wire, Inc., NuTex Manufacturing Company, LLC, PCM Company, Rocket Motorcycles, Inc., and Tex-Tech Industries, Inc.  Am. Compl. ¶¶ 8-18.

[4] The Defendants named in the Amended Complaint are Arkansas Best Corporation, ABF Freight System, Inc., Averitt Express, Inc., Con-Way, Inc., Con-Way Freight, Inc., Estes Express Lines, FedEx Freight Corporation, FedEx National LTL, Inc., Old Dominion Freight Line, Inc., SAIA, Inc., SAIA Motor Freight Line LLC, UPS Ground Freight, Inc., and YRC Worldwide, Inc.  Am.

Plaintiffs allege the Defendants conspired to fix prices of LTL fuel surcharges added to customers' bills, in violation of Section 1 of the Sherman Act. 15 U.S.C. § 1. Plaintiffs claim the Defendants agreed to charge the same fuel surcharges to all customers and to assess the charges in a common manner. Am. Compl. ¶ 4. Plaintiffs allege these fuel surcharges overcompensated the Defendants for their increase in actual fuel costs and that the Defendants applied fuel surcharges that bore no rational relationship to the cost of fuel for a particular shipment. Id. Plaintiffs allege the Defendants set their LTL fuel surcharge rates as a percentage of base rates, and that the Defendants used common indices, timing, and trigger points for adjusting the fuel surcharge percentages. Id. ¶ 6.

Plaintiffs bring this action on their behalf and on behalf of others who are direct purchasers of LTL freight transportation services from the Defendants, and who paid an LTL fuel surcharge from July 31, 2003 to the present. Id. ¶ 40. Plaintiffs purport to bring their class allegations pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3). Id.

The Defendants provide what is known as LTL transportation services. Within the for-hire trucking industry, there are two major segments – truckload

───────────────

Compl. ¶¶ 19-31.

("TL") shipping and LTL shipping.  Am. Compl. ¶ 48.  TL carriers move goods by full truckload from origin to destination.  Id.  LTL carriers, in contrast, consolidate, haul, and distribute goods through a network of terminals in LTL lots.  A typical LTL operation collects small shipments from local shipper locations, moves them over the road between terminals in truckloads, and breaks them up at the destination terminal for local delivery.  Id.  The TL market consists of approximately 53,000 firms, and a substantial share of the total revenue for the market belongs to small and middle-sized firms.  Id. ¶ 49.

The LTL market is concentrated.  During the class period, the Defendants are alleged to have held a collective share of over 75% of the LTL market.  Id.  The Plaintiffs allege several characteristics of the LTL market which facilitate consolidation and erect barriers to entry by competitors.  They allege the LTL market is concentrated in such a way that new competitors effectively cannot enter the market without purchasing an existing provider of transportation services in the market.  Id. ¶ 51(d).  Plaintiffs allege no one has entered the market since 1990.  Id. New competitors also face substantial costs, and thus a barrier to entry, including the costs of acquiring delivery trucks and depots, personnel, and industry expertise. Id. ¶ 51(e).

LTL services are effectively fungible and interchangeable between carriers, id. ¶ 51(a), and customers distinguish between LTL service providers primarily on the basis of price. Id. ¶ 51(b). Plaintiffs allege the demand for LTL services is inelastic. Id. ¶ 51(c). Customers cannot pre-purchase or "stock up" on LTL services. Id. ¶ 51(g).

The Defendants are alleged to have similar cost structures. Plaintiffs assert that none of the Defendants is significantly more efficient than the industry average. Id. ¶ 51(j). The LTL industry has a high ratio of fixed to variable costs. Id. ¶ 51(i). Fixed costs, such as capital equipment, software, advertising, and recruitment and training costs are high relative to variable costs, such as fuel. Id. Profit margins in the LTL industry are slim. Id. ¶ 51(k).

Plaintiffs allege the level of cooperation within the LTL industry is high. Id. ¶ 51(l). The Defendants allegedly communicate with each other through publication on their websites, through discussion of possible mergers or asset acquisitions, and through trade association meetings. Id. ¶ 51(m), (n). Plaintiffs assert there is no economic reason for the Defendants to list fuel surcharge pricing policies on their websites. Defendants also use identical pricing software,

allegedly allowing the Defendants to monitor compliance with agreed-upon fuel surcharges.  Id.

Before 1980, almost all LTL carriers belonged to a regional motor carrier rate bureau, through which rates were set for various LTL freight classes.  Am. Compl. ¶ 52.  All rates were subject to challenge by application to the Interstate Commerce Commission ("ICC"), and later the Surface Transportation Board ("STB"), which replaced the ICC.  Id. ¶ 52.  In 1980, the Motor Carrier Act, Pub. L. No. 96-296, largely repealed interstate motor carrier regulation.  Id. ¶ 53.  With the 1994 Trucking Industry Regulatory Reform Act, Pub. L. No. 103-311, Congress relieved motor carriers of the obligation to file general freight tariffs. Id. ¶ 54.  In 1995, the ICC Termination Act, Pub. L. No. 104-88, removed most of the remaining regulatory framework of interstate motor carriers.  Id. ¶ 55. Plaintiffs allege that the Defendants are no longer eligible for antitrust immunity and that following the passage of the ICC Termination Act, the Defendants set their own rates in accordance with market conditions.  Id. ¶ 58.

The claims in this case primarily concern fuel surcharges imposed by the Defendants since 2003.  Fuel surcharges are not new – Plaintiffs allege the Defendants have been imposing fuel surcharges intermittently for decades.  Am.

Compl. ¶ 59.  In July and August 1999, Plaintiffs allege that Defendants ABF,

Roadway Express, Inc., YRC, FedEx Freight's then-LTL subsidiary, and Old

Dominion all attempted to impose surcharges on fuel.  Id. ¶ 63.  Before July 2003,

Plaintiffs claim there was significant disparity in the fuel surcharges imposed

among different carriers.  Id. ¶ 74.

Beginning in July 2003, however, Plaintiffs allege the Defendants

exchanged information in both private and public settings regarding their fuel

surcharge levels.  They claim the Defendants began to agree to assess the same fuel

surcharges, based on a fixed percentage of a shipment's base freight rate.  Id. ¶¶

64-65.  Plaintiffs claim the Defendants agreed to use a common index, common

trigger points for adjustment, and a common methodology to assess fuel

surcharges, all of which Plaintiffs allege is evidence that the Defendant's agreed to

fix prices.  Id. ¶ 66.

Defendants' fuel surcharges are indexed to the publicly-available index of

diesel fuel prices published by the United States Department of Energy.  Id. ¶ 67.

To communicate movements in pricing and to police price fixing, Plaintiffs allege,

each Defendant published its current fuel surcharge and possible future surcharges

on its website.  Id.  Plaintiffs allege this information sharing and agreement created

a situation where each Defendant's fuel surcharge was effectively set by all the others and moved in lockstep with other carriers. On page 23 of the Consolidated Amended Complaint, the Plaintiffs set forth a table showing fuel surcharges of ten Defendants dated April-May 2007. The table shows each Defendant's fuel surcharge as a function of the price-per-gallon of diesel fuel. At $1.80 per gallon, for instance, the Defendants charged fuel surcharge rates between 8.5-9.0%, with six carriers charging exactly 8.9%. At $3.00 per gallon, the Defendants charged fuel charge rates between 20.5-20.9%, with eight carriers charging exactly 20.9%. Plaintiffs allege the Defendants' fuel surcharge rates, as indexed to the Department of Energy's diesel fuel price report, were essentially equal across all carriers.

Plaintiffs allege it would not have been in the Defendants' business interests to use a common form index, trigger points, and computation methodology to calculate fuel surcharges unless the Defendants had the benefit of a conspiracy. Id. ¶ 69. Plaintiffs claim the Defendants agreed to: "(1) charge LTL fuel surcharges to customers; (2) compute and apply them in a common manner; (3) set and compute them as percentages of their customers' base freight rates using a common index so that any increases were not reflective of actual fuel costs increases; (4) use common trigger points; (5) maintain near uniformity of the

percentages charges; (6) portray the surcharges to customers as necessary to recoup

unexpected fuel cost increases when they were not; (7) use the surcharges as

revenue generators; and (8) maintain an appearance of competing on LTL freight

shipment rates, while using LTL fuel surcharges as revenue-enhancement measures

shielded from normal competitive forces."  Id. ¶ 70.

        Plaintiffs allege the Defendants communicated with each other through

website postings of their fuel surcharges.  Plaintiffs also allege that Defendants

ABF, Averitt, Con-Way, Estes, FedEx, Old Dominion, UPS, and YRC were

members of a trade association called the National Motor Freight Traffic

Association ("NMFTA").  Id. ¶ 97.  The NMFTA is the parent entity of the

National Classification Committee ("NCC"), the motor bureau that classifies

freight for use with LTL rate schedules.  The Defendants are also alleged to

participate in meetings of the American Trucking Association ("ATA").

Plaintiffs allege the Defendants' unspecified attendance at meetings of the

NMFTA, NCC, and ATA gave them the "means and opportunity to establish,

implement and enforce their agreement to use LTL fuel surcharges in the anti-competitive manner detailed" in the Amended Complaint.  Id.[5]

Plaintiffs allege the Defendants' fuel surcharge rates have consistently and significantly exceeded the costs of actual fuel price increases.  Am. Compl. ¶ 71. Plaintiffs base this allegation, in part, by noting that as of May 2007 if the price of diesel fuel rose by 50%, the percentage fuel surcharge would nearly double from 10.9% to 20.9% for most Defendants.  Id. ¶ 72.  Plaintiffs allege the fuel surcharge costs were not justified by actual increases in the price of fuel over the Class Period.  Id. ¶ 75.  Defendants' fuel surcharges are flat rate fees across all contracts and do not depend on the actual cost of fuel for any particular individual trip.  Id. ¶ 75.  Plaintiffs allege this pricing structure allowed the Defendants to recoup fees that exceeded what the Defendants actually spent on fuel.  Id. ¶ 76.  The Defendants allegedly used fuel surcharges as profit-maximizing devices.  Id. ¶ 77. These pricing practices enabled LTL carriers to earn higher profits than the TL

---

[5]  The Plaintiffs allege the NMFTA and NCC held meetings in May 2003, August 2003, November 2003, February 2004, May 2004, August 2004, November 2004, May 2005, August 2005, November 2005, February 2006, May 2006, August 2006, November 2006, and June 2007.  Am. Compl. ¶¶ 98-102.  Plaintiffs allege the ATA holds regular meetings, including an annual meeting, an annual Management Council & Exhibition, and a Diesel Fuel Strategies Workshop.  Id. ¶ 103.

industry, and Plaintiffs allege generally that the Defendants' profits rose "dramatically" during the Class Period.  Id. ¶ 80.

On July 23, 2007, FedEx Freight unilaterally reduced its standard LTL fuel surcharges by 25%.  Id. ¶ 91.  FedEx began to use its lower fuel surcharge rates as a means to differentiate itself from its competitors.  Id. ¶ 92.  Plaintiffs claim there is "anecdotal evidence" that other Defendants have charged discounted fuel surcharges since July 2007, but no other Defendant has publicly matched FedEx's price reductions.  Id. ¶ 94.

On May 23, 2008, the Plaintiffs filed the Consolidated Amended Class Action Complaint.  Plaintiffs claim the Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.  Plaintiffs claim the Defendants' contract, combination, or conspiracy resulted in an agreement through which the Defendants fixed, maintained, and standardized prices for fuel surcharges for LTL freight transportation.  Am. Compl. ¶ 109.  Plaintiffs seek class certification pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and Plaintiffs seek treble damages.

On June 25, 2008, the Defendants moved to dismiss the Consolidated Amended Complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  The Defendants also request that the Court take judicial notice of several attached documents.

## II.   DISCUSSION

### A.   Defendants' Request for Judicial Notice

Along with their Motion to Dismiss, the Defendants filed a request for judicial notice of twelve attached exhibits which the Defendants contend are of unquestioned authenticity and are relied on or are integral to the Consolidated Amended Complaint.  Plaintiffs oppose the Defendants' request, specifically with respect to historical fuel surcharge rates of certain defendants.

### 1.   Governing Law

Federal Rule of Evidence 201(b) permits the Court to take judicial notice of facts which are "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to move for dismissal of a complaint which fails to state a claim upon which relief can be granted.  A Rule 12(b)(6) motion tests the legal sufficiency of the plaintiff's pleading.  In evaluating a Rule 12(b)(6) motion to dismiss, the Court ordinarily is limited to consideration of the pleadings in the case and any documents attached to the pleadings.  <u>Brooks v. Blue Cross & Blue Shield of Fla., Inc.</u>, 116 F.3d 1364, 1368-69 (11th Cir. 1997); Fed. R. Civ. P. 10(c) (documents attached as exhibits to pleadings considered part of the pleadings for all purposes).  If materials outside the pleadings are presented for consideration on a motion to dismiss, and those materials are not excluded by the Court, the Court is required to convert the motion to dismiss to a motion for summary judgment under Federal Rule 56.  Fed. R. Civ. P. 12(d); 5C Charles Alan Wright & Arthur R. Miller, <u>Federal Practice & Procedure</u> § 1366 (3d ed. 2004).

Certain documents, even if not attached to the pleadings, can be considered as part of the pleadings without converting the motion to one for summary judgment.  These documents include matters of which the district court can take judicial notice, and, of relevance to this action, documents which are referred to in the complaint and which are central or integral to the plaintiff's claims.  <u>Id.</u>  The

Eleventh Circuit has explained that, "where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment." Brooks, 116 F.3d at 1369; accord Adamson v. Poorter, No. 06-15941, 2007 WL 2900576, at *2 (11th Cir. Oct. 4, 2007); see also Fin. Sec. Assur., Inc. v. Stephens, Inc., 500 F.3d 1276, 1284 (11th Cir. 2007) ("This court recognizes an exception, however, in cases in which a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss.").

### 2.   Analysis

Defendants ask the Court to take judicial notice of three types of facts presented in documents not attached to the Complaint.  Defendants' Exhibit A is a compilation of Weekly Retail On-Highway Diesel Prices from the website of the United States Department of Energy, Energy Information Administration.  Exhibits B and C are articles purportedly appearing in a periodical called Logistics Today.

Exhibits D through L are historical web printouts of certain of the Defendant's

online published fuel surcharge rates for effective dates from 2001 to 2005.

Plaintiffs object to the Defendants' request for judicial notice.  Plaintiffs

specifically object to Exhibits D through L; Plaintiffs do not discuss Exhibits A

through C in their objections.  Plaintiffs argue that Exhibits D through L are not of

unquestioned authenticity because they present information from unverified web

archives.  Plaintiffs contend they are unable to verify the accuracy of the

information without the benefit of discovery.

The Court concludes that judicial notice should not be taken of Exhibits D

through L.  Even if the Exhibits as presented by the Defendants are authentic and

accurate, the factual information presented in them is best considered on summary

judgment after inquiring about them through discovery.  Defendants used Exhibits

D through L to support their contradiction of allegations in the Complaint –

specifically that the Defendants assessed similar fuel surcharges all at the same

time.  Without the benefit of discovery, however, the Plaintiffs would be unable to

factually rebut the Defendants' arguments.  Exhibits D through L present only a

limited snapshot through which to view the Plaintiffs' allegations.  Exhibits D

through L should also be excluded because their source, a web archive service, is

not an unquestionable source to establish authenticity sufficient for this Court to take judicial notice where the Plaintiffs asserted objections.

The Court also excludes Exhibits B and C.  Those periodical articles are not mentioned in the Complaint and are not "integral" to the Complaint.  The Court takes judicial notice of Exhibit A because the information presented is drawn from a United States Government agency source, the accuracy of which cannot reasonably be questioned.  The actual government-published diesel fuel prices are relevant and integral to the Complaint because Plaintiffs specifically allege that the Defendants "agreed to impose identical or nearly identical fuel surcharges by agreeing to tie their fuel surcharges to a publicly available index of diesel fuel process ('Fuel index') published by the United States Department of Energy ('DOE')."  Am. Compl. ¶ 67.

Defendants' request for judicial notice is granted as to Exhibit A and denied as to Exhibits B through L.

### B.  Defendants' Motion to Dismiss

#### 1.  The Standard For A Motion To Dismiss

Defendants move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the claims against them for failure to state a claim upon which relief can be

granted.  The law governing motions to dismiss pursuant to Rule 12(b)(6) is

well-settled.  Dismissal of a complaint is appropriate "when, on the basis of a

dispositive issue of law, no construction of the factual allegations will support the

cause of action."  Marshall County Bd. of Educ. v. Marshall County Gas Dist., 992

F.2d 1171, 1174 (11th Cir. 1993).  The court accepts the plaintiff's allegations as

true, Hishon v. King & Spalding, 467 U.S. 69, 73 (1984), and considers the

allegations in the complaint in the light most favorable to the plaintiff.  Watts v.

Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007).  Ultimately, the complaint is

required to contain "enough facts to state a claim to relief that is plausible on its

face."  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007).   "To survive a

motion to dismiss, plaintiffs must do more than merely state legal conclusions;

they are required to allege some specific factual bases for those conclusions or face

dismissal of their claims."  Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1263

(11th Cir. 2004) ("[C]onclusory allegations, unwarranted deductions of facts or

legal conclusions masquerading as facts will not prevent dismissal.") (citations

omitted).

Federal Rule of Civil Procedure 8(a)(2) requires the plaintiff to state "a short

and plain statement of the claim showing that the pleader is entitled to relief."  Fed.

R. Civ. P. 8(a)(2).  Whether the Plaintiffs have adequately stated a claim in this

case depends on application of the Supreme Court's decision in <u>Bell Atl. Corp. v.</u>

<u>Twombly</u>, 550 U.S. 544, 127 S. Ct. 1955 (2007).

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the

form of trust or otherwise, or conspiracy, in restraint of trade or commerce among

the several states, or with foreign nations . . . ."  15 U.S.C. § 1.  In <u>Twombly</u>, the

Supreme Court considered the plaintiffs' allegations that several major

telecommunications providers engaged in "certain parallel conduct unfavorable to

competition, absent a factual context suggesting agreement."  <u>Twombly</u>, 127 S. Ct.

at 1961.  The Supreme Court held that the plaintiffs had failed to state a claim

because their allegations did not plausibly suggest an anticompetitive conspiracy

instead of identical, independent parallel actions.  <u>Id.</u>

> Because § 1 of the Sherman Act 'does not prohibit [all]
> unreasonable restraints of trade . . . but only restraints
> effected by a contract, combination, or conspiracy,'
> <u>Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S.
> 752, 775 (1984), '[t]he crucial question' is whether the
> challenged anticompetitive conduct 'stem[s] from
> independent decision or from an agreement, tacit or
> express,' <u>Theatre Enters., Inc. v. Paramount Film Distrib.</u>
> <u>Corp.</u>, 346 U.S. 537, 540 (1954).  While a showing of
> parallel 'business behavior is admissible circumstantial
> evidence from which the fact finder may infer

> agreement,' it falls short of 'conclusively establish[ing]
> agreement or . . . itself constitut[ing] a Sherman Act
> offense.'  Id. at 540-541.  Even 'conscious parallelism,' a
> common reaction of 'firms in a concentrated market
> [that] recogniz[e] their shared economic interests and
> their interdependence with respect to price and output
> decisions' is 'not in itself unlawful.'  Brooke Group Ltd.
> v. Brown & Williamson Tobacco Corp., 509 U.S. 209,
> 227 (1993).

Id. at 1964.  A plaintiff cannot state an antitrust claim by merely showing parallel

conduct and from it divine that an agreement must be the source from which the

parallel conduct arose.  A plaintiff likewise cannot state an antitrust claim by

showing only that the Defendants made price information publicly available and

thus had the opportunity to conspire – a "conspired in the open" sort of argument.

Parallel conduct is "just as much in line with a wide swath of rational and

competitive business strategy unilaterally prompted by common perceptions of the

market," id., as it is with anticompetitive behavior.  That is why at the summary

judgment stage a plaintiff must present evidence which tends to rule out the

possibility that the defendants were acting independently.  Id.; Matsushita Elec.

Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986); Williamson Oil

Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1300 (11th Cir. 2003) ("Evidence

that does not support the existence of a price fixing conspiracy any more strongly

than it supports conscious parallelism is insufficient to survive a defendant's

summary judgment motion.").

In <u>Twombly</u>, the Supreme Court addressed the threshold question of what a

plaintiff must plead in the complaint to state an antitrust conspiracy claim. The

Court recognized the liberal minimal standards imposed by Federal Rule 8(a)(2)

but also acknowledged that "[f]actual allegations must be enough to raise a right to

relief above the speculative level . . . ." <u>Twombly</u>, 127 S. Ct. at 1965. The Court

concluded:

> In applying these general standards to a § 1 claim, we
> hold that stating such a claim requires a complaint with
> enough factual matter (taken as true) to suggest that an
> agreement was made. Asking for plausible grounds to
> infer an agreement does not impose a probability
> requirement at the pleading stage; it simply calls for
> enough fact to raise a reasonable expectation that
> discovery will reveal evidence of illegal agreement. And,
> of course, a well-pleaded complaint may proceed even if
> it strikes a savvy judge that actual proof of those facts is
> improbable . . . . It makes sense to say, therefore, that an
> allegation of parallel conduct and a bare assertion of
> conspiracy will not suffice. Without more, parallel
> conduct does not suggest conspiracy, and a conclusory
> allegation of agreement at some unidentified point does
> not supply facts adequate to show illegality. Hence,
> when allegations of parallel conduct are set out in order
> to make a § 1 claim, they must be placed in a context that
> raises a suggestion of a preceding agreement, not merely

> parallel conduct that could just as well be independent
> action.

Twombly, 127 S. Ct. at 1965-66.  The Court also considered, and explicitly

rejected, its earlier formulation for the Rule 12(b)(6) pleading standard: "'[T]he

accepted rule [is] that a complaint should not be dismissed for failure to state a

claim unless it appears beyond doubt that the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief.'" Id. at 1968 (quoting

Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  The Court decided that "this

famous observation has earned its retirement."  Id. at 1969.[6]

The Court based its holding on several characteristics of cases alleging

parallel conduct as antitrust violations.  The complaint must allege more than

parallel conduct; it must directly allege an agreement, that rests on more than mere

"legal conclusions resting on the prior allegations."  Twombly, 127 S. Ct. at 1970.

The Court also noted that antitrust complaints carry with them the potential for

---

[6]  Several commentators and courts have questioned whether the Supreme
Court's holding in Twombly applies to all civil cases or only to those alleging
claims under Section 1 of the Sherman Act.  The prevailing view seems to be that
the Twombly standard is a general one not limited to the antitrust context.  See,
e.g., 5 Federal Practice & Procedure § 1216.  The Twombly standard clearly
applies to the Sherman Act claims in this case.

massive discovery expenses, and that a district court "must retain the power to

insist upon some specificity in pleading before allowing a potentially massive

factual controversy to proceed." Id. at 1967 (quotations omitted).

The plaintiff must allege facts that "reach the level of suggesting

conspiracy" and a "reasonably founded hope that the discovery process will reveal

relevant evidence." Id. at 1967 (internal quotation marks omitted). The Court

carefully considered what must be pleaded at the motion to dismiss stage:

> The need at the pleading stage for allegations plausibly
> suggesting (not merely consistent with) agreement
> reflects the threshold requirement of Rule 8(a)(2) that the
> 'plain statement' possess enough heft to 'sho[w] that the
> pleader is entitled to relief.' A statement of parallel
> conduct, even conduct consciously undertaken, needs
> some setting suggesting the agreement necessary to make
> out a § 1 claim; without that further circumstance
> pointing toward a meeting of the minds, an account of a
> defendant's commercial efforts stays in neutral territory.
> An allegation of parallel conduct is thus much like a
> naked assertion of conspiracy in a § 1 complaint: it gets
> the complaint close to stating a claim, but without some
> further factual enhancement it stops short of the line
> between possibility and plausibility of 'entitle[ment] to
> relief.' Cf. DM Research, Inc. v. College of Am.
> Pathologists, 170 F.3d 53, 56 (1st Cir. 1999) ('[T]erms
> like 'conspiracy,' or even 'agreement,' are border-line:
> they might well be sufficient in conjunction with a more
> specific allegation-for example, identifying a written
> agreement or even a basis for inferring a tacit agreement,

> . . . but a court is not required to accept such terms as a
> sufficient basis for a complaint').

Id. at 1966.  The Court also noted in dicta that, "[t]he parties . . . agree that

'complex and historically unprecedented changes in pricing structure made at the

very same time by multiple competitors, and made for no other discernible reason'

would support a plausible inference of conspiracy."  Id. at 1965 n.4.

In dismissing the plaintiffs' complaint, the Twombly Court found that the

facts alleged showed parallel conduct but did not plausibly suggest that the parallel

conduct alleged was caused by unlawful agreement, instead of rational independent

business decisions.  The Court noted that the plaintiffs had not alleged facts

showing an agreement, but had instead merely asserted an agreement as a "legal

conclusion resting on the prior allegations."  Id. at 1970.  The Court also noted that

the complaint's general allegation of a seven-year span in which the Section 1

violations allegedly occurred was insufficient to allege the specific time, place, or

person involved in the alleged conspiracies.  Id. at 1970 n.10.

Post-Twombly, district courts around the country have applied the Supreme

Court's holdings to antitrust allegations.  These cases suggest several insights

helpful here.  First, a plaintiff can allege the existence of a Section 1 conspiracy

either directly or through circumstantial evidence.  Circumstantial evidence of

conspiracy, however, must do more than merely show parallel conduct.  A plaintiff

also must plead *facts* plausibly suggesting that parallel conduct was caused by an

agreement, not merely that parallel conduct could just as well have been caused by

independent action.  Twombly, 127 S. Ct. at 1965-66; In re Se. Milk Antitrust

Litig., 555 F. Supp. 2d 934, 941 (E.D. Tenn. 2008); City of Moundridge v. Exxon

Mobil Corp., 250 F.R.D. 1, 4-5 (D.D.C. 2008); In re Air Cargo Shipping Servs.

Antitrust Litig., No. 1:06-md-01755 (JG) (VVP) (E.D.N.Y. Sept. 26, 2008) (Report

and Recommendation) at 9.[7]

---

[7]  The Defendants' reliance on Williamson Oil Co. v. Philip Morris USA,
346 F.3d 1287 (11th Cir. 2003), is misplaced.  That case concerns the evidentiary
burden on summary judgment.  To avoid summary judgment, the plaintiff must
produce evidence, such as "plus factors," which would tend to exclude the
possibility that the alleged conspirators acted independently.  Id. at 1300-01.
Twombly was concerned instead with the pleading burden necessary to avoid a
motion to dismiss, and the Supreme Court explicitly distinguished between the
"probability requirement" stated in Matsushita Elec. Industrial Co. v. Zenith Radio
Corp., 475 U.S. 574 (1986), (on which Williamson relies), and the "plausibility"
threshold necessary to survive a motion to dismiss.  The Court is not permitted on a
motion to dismiss to evaluate the relative strengths of the uncontroverted evidence
submitted by the parties.  The Court is required to accept the plaintiff's factual
allegations as true, and in the antitrust context to evaluate whether the plaintiff's
allegations raise a reasonable expectation that discovery will reveal evidence of
illegal agreement.

Second, for allegations of conspiracy to reach the plausibility threshold required by Twombly, they often must include factual allegations such as the specific time, place, and persons involved in the conspiracy alleged.  In re Se Milk Antitrust Litig., 555 F.2d at 942.  In several cases in which district courts have denied motions to dismiss antitrust conspiracies, the plaintiffs were able to allege specific dates, or at least a specific limited date range, during which the defendants were thought to have reached an anticompetitive agreement.  In In re OSB Antitrust Litigation, No. 06-826, 2007 WL 2253419, at *3 (E.D. Pa. Aug. 3, 2007), the plaintiffs alleged that the defendants reached a tacit agreement on or about June 1, 2002 to raise oriented strand board ("OSB") prices.  Plaintiffs also alleged that after June 1, 2002, the defendants took several parallel actions to reduce the supply of OSB and thereby drive up the price.  Id.  The district court held that the plaintiffs had adequately pleaded facts from which a conspiracy plausibly could be inferred.  In City of Moundridge v. Exxon Mobil Corp., 250 F.R.D. at 4, the district court denied the defendants' motion to reconsider the court's denial of the motion to dismiss.  The plaintiffs' complaint adequately "identifie[d] the years and locations where the agreement was reached and the defendants who participated." Id.  In In re Graphics Processing Units Antitrust Litig., 540 F. Supp. 2d 1085 (N.D.

Cal. 2007), the district court granted the plaintiffs' motion to amend their original complaint over the defendants' motion to dismiss.  Plaintiffs added very specific allegations about the defendants' behavior before the alleged conspiracy and specific allegations about the defendants' pricing behavior, from which a conspiracy could plausibly be inferred.  Id. at 1090.  The plaintiffs were able to specifically allege several specific dates on which anticompetitive behavior was alleged to occur, including specific allegations about behavior before and during the alleged conspiracy, to plausibly allege that a pricing conspiracy had been reached.  Id. at 1091-95; see also In re Rail Freight Fuel Surcharge Antitrust Litig., No. 1:07-mc-00489-PLF, at 9 (D.D.C. Nov. 7, 2008) ("Plaintiffs go on to identify specific occasions, in particular during the fall 2003 AAR meetings – on October 2-3 and December 11-12, 2003 – where defendants met and allegedly agreed to solve this problem by promulgating the fuel surcharge program that would become the AIILF.").

Courts presented with less-specific allegations of conspiracy have granted the defendants' motion to dismiss.  In In re Air Cargo Shipping Antitrust Litig., the magistrate judge recommended dismissal of a complaint which asserted in a conclusory fashion that the defendants held "meetings," "secret meetings,"

communications," or "joint agreements."  No. 1:06-md-01755 (JG) (VVP), at 13

(E.D.N.Y. Sept. 26, 2008).  "These allegations are so broad and so vague that the

fail to stand for anything, much less raise a plausible inference of an agreement."

Id. at 14; see also In re Elevator Antitrust Litig., 502 F.3d 47, 51 n.5 (2d Cir. 2007)

(affirming district court's dismissal of complaint alleging that the defendants "(a)

Participated in meetings in the United States and Europe to discuss pricing and

market divisions; (b) Agreed to fix prices for elevators and services; (c) Rigged

bids for sales and maintenance; (d) Exchanged price quotes; (e) Allocated markets

for sales and maintenance; (f) 'Collusively' required customers to enter long-term

maintenance contracts; and (g) Collectively took actions to drive independent

repair companies out of business.").  As the District Court for the Eastern District

of Tennessee succinctly stated:  "To allege an agreement between antitrust

co-conspirators, the complaint must allege facts such as a specific time, place, or

person involved in the alleged conspiracies to give a defendant seeking to respond

to allegations of a conspiracy an idea of where to begin."  In re Se Milk Antitrust

Litig., 555 F. Supp. 2d at 942 (internal quotation marks omitted).

     Third, district courts often rely on the Supreme Court's footnote suggesting

that, "complex and historically unprecedented changes in pricing structure made at

the very same time by multiple competitors, and made for no other discernible reason would support a plausible inference of conspiracy." <u>Twombly</u>, 127 S. Ct. at 1965 n.4.  In <u>In re Graphics Processing Units Antitrust Litig.</u>, the court granted the plaintiffs leave to amend over the defendants' motion to dismiss in large part because the plaintiffs were able to allege with specificity the defendants' behavior before and during the alleged conspiracy.  540 F. Supp. 2d at 1092-95.   In <u>In re Western States Wholesale Natural Gas Antitrust Litig.</u>, No. 2:03-cv-01431-PMP-PAL, at 6 (D. Nev. Feb. 19, 2008), the district court denied the defendants' motion to dismiss where, "Plaintiffs allege a historically unprecedented change in natural gas prices as the result of widespread false reporting of trade information made by multiple competitors during the same time period in the natural gas industry for no discernible reason other than conspiracy."  <u>Id.</u>  Where the plaintiff fails to show, however, that departures from a historical pricing practice are the result of anticompetitive practices, dismissal of the complaint may be appropriate.  <u>In re Air Cargo Shipping Servs. Antitrust Litig.</u>, at 16 ("While the fuel and war risk surcharges may have been departures from typical pricing practices, the plaintiffs fail to take the necessary next step of excluding the possibility that the defendants' parallel conduct was 'in line with a wide swath of rational and competitive

business strategy unilaterally prompted by common perceptions of the market.'")
(quoting <u>Twombly</u>, 127 S. Ct. at 1964).  Dismissal may similarly be appropriate
where pricing movements among competitors lag from three to six months.  <u>In re</u>
<u>Late Fee and Over-Limit Fee Litig.</u>, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007)
("time lags of three to six months between pricing moves 'refute rather than
support' allegations of conspiracy") (citing <u>In re Baby Food Antitrust Litig.</u>, 166
F.3d 112, 131-32 (3d Cir. 1999)).

      Fourth, the pleading standard in antitrust cases announced in <u>Twombly</u> is
rooted in the practical reality that in large antitrust cases the discovery process can
be enormously expensive.  This fact requires that the Court retain the power to
insist upon pleadings that provide a factual basis showing that an antitrust claim is
"plausible" before subjecting antitrust defendants to potentially massive discovery
proceedings.  Large discovery costs would tend to encourage cost-conscious
defendants to settle even "anemic" cases before incurring discovery expenses.
<u>Twombly</u>, 127 S. Ct. at 1967.  As this Court observed:  "Motions to dismiss are
generally disfavored since they short circuit a plaintiff's case at a very early stage
of the litigation.  However, they also serve the useful function of ending
non-meritorious cases before a defendant is subjected to possibly extensive

discovery and litigation costs.  This is especially true in anti-trust litigation, and even more so when the anti-trust case seeks class action status."  <u>Jacobs v. Tempur-Pedic Int'l, Inc.</u>, No. 4:07-cv-02-RLV, 2007 WL 4373980, at *2 (N.D. Ga. Dec. 11, 2007) (granting defendants' motion to dismiss); <u>see also</u> <u>In re Elevator Antitrust Litig.</u>, 502 F.3d at 50 n.4.

### 2.      Discussion

Against the backdrop of principles from the Supreme Court's <u>Twombly</u> decision and how they have been applied by other courts, this Court turns to considering whether the Plaintiffs' consolidated complaint pleads sufficient facts from which an antitrust conspiracy plausibly can be inferred.  The Court determines that, as pleaded, Plaintiffs do not adequately state a claim.

### a.      Plaintiffs' Allegations

The gravamen of the consolidated complaint is that beginning on approximately July 31, 2003, the Defendants conspired with each other to assess comparable fuel surcharges at an artificially-elevated level.  "Defendants agreed with each other to charge LTL fuel surcharges to customers and to set and assess them in a common manner . . . . Defendants applied the fuel surcharges so that they bore no relationship to the cost of fuel for a particular trip."  Am. Compl. ¶ 4.

Plaintiffs have not pleaded direct evidence of a conspiracy to fix prices, such as, for instance, allegations of a particular communication between the Defendants suggesting agreement.  Nor do they allege collective pricing conduct that reasonably centers on some fixed date.  While the allegations allow one to imagine that a conspiracy may have occurred, imagination is not enough.  Based on the allegations presented, the Court is required under Twombly to evaluate whether the *facts* alleged support an inference that a conspiracy is plausible.  On this issue, the Amended Complaint falls short.

The only set of facts predicating Plaintiffs' allegations are the allegations throughout that the Defendants did in fact "set their LTL fuel surcharges as a percentage of the base rates that they charged their customers, and they used common indices, timing, and trigger points for adjusting the percentages."  Am. Compl. ¶ 6.  Plaintiffs allege that the Defendants have imposed fuel surcharges for decades but that the practice during the Class Period differs "markedly" from the previous period.  Id. ¶ 59.  This is so because the Defendants now charge roughly the same surcharges, id. ¶ 60, recoup excess profits from fuel surcharges, id. ¶ 61, set fuel surcharges as a percentage of the cost of the base freight rate, id. ¶ 62, and "presented a unified front on fuel surcharges, with the result that shippers were far

less successful in avoiding having to pay LTL fuel surcharges to Defendants."
Id. ¶ 63.  Careful examination of those allegations shows that the five paragraphs
considered *in toto* allege the same thing that Plaintiffs allege at the outset of the
Complaint – that the Defendants used common indices, timing, and trigger points
for setting their surcharges for fuel.

The consolidated complaint's 110 paragraphs offer few distinct factual
allegations.  The majority of Plaintiffs' pleading is conjecture and argument, in
some instances based on facts alleged, and in some instances based on unsupported
argument.  Paragraphs 1, 3, 5 and 7 each allege elements of a cause of action
without factual support.  Paragraphs 8 through 31 allege the names and residencies
of the parties.  Paragraphs 32 and 33 make unsupported allegations about unknown
conspirators.  Paragraphs 34 through 39 are concerned with jurisdiction and venue.
Paragraphs 40 through 46 make allegations supporting class certification.
Paragraphs 104 through 110 simply allege the legal elements necessary to state
Plaintiffs' claims under Section 1 of the Sherman Act and Section 4 of the Clayton
Act.

Excepting the scant factual allegations in paragraphs 2, 4, and 6, the
consolidated complaint does not state a single fact relevant to the central claim

until paragraph 47.  Paragraphs 47 through 63 allege facts, most of which (¶¶ 47-58) allege the structural, business, and regulatory characteristics of the LTL industry.  Paragraphs 64 through 74 should be the heart of Plaintiffs' complaint, yet only paragraphs 67, 68, and 71-74 actually allege a fact.  The rest are either arguments (¶¶ 64, 66, 69-70) or a fact alleged without any actual support (¶ 65).  Likewise, paragraphs 75, 76, 77, and 76[8] each argue why uniform fuel surcharges are anticompetitive, without presenting a fact from which the Court could infer conspiracy.  Paragraphs 77 (page 29) through 90 allege facts detailing how fuel surcharges were profitable to the Defendants.  Paragraphs 91 through 96 discuss defendant FedEx's alleged unilateral decision to reduce its fuel surcharge and the effect that decision had on other LTL carriers.  Finally, paragraphs 97 through 103 allege organizational membership and meeting dates over a four-year period, at which, Plaintiffs argue, the Defendants must have conspired to set LTL fuel surcharges.

---

[8]  The consolidated complaint has a numbering error on page 28.  The paragraph following paragraph 77 is listed as "76," and all succeeding paragraphs are numbered accordingly, beginning with a second paragraph 77 on page 29.  For ease of reference, the Court refers to the paragraph numbers as shown in the consolidated complaint, with the caveat that there are two paragraph 76s and two paragraph 77s.

Read as a consistent whole, Plaintiffs at most allege parallel pricing conduct, the sharing of surcharge price information publicly using websites, and the claim that opportunities arose at which the Defendants could have met and hatched a price-fixing conspiracy.  Embedded in these allegations is the prospect, unsupported by factual allegations, that discovery might support that an antitrust conspiracy did in fact result from the confluence of the events alleged.

The Amended Complaint also alleges that fuel surcharges were imposed intermittently for decades by the LTL industry.  Am. Compl. ¶ 59.  Throughout the 1980s and 1990s, the LTL industry was regulated by the federal government, which burdened the carriers in part by requiring them to publicly disclose their general freight tariffs and charges.  Id. ¶¶ 52-57.  LTL carriers presumably would have been required to publicly file any of their intermittently-charged fuel surcharges as well.  Beginning in 1995, Congress began to deregulate the LTL industry; by 2007, LTL carriers are essentially free of regulation and can charge rates individually according to their own interests and market conditions.  Id. ¶¶ 55-58.

Beginning in July and August 1999, LTL carriers such as ABF, Roadway Express, Inc., YRC, FedEx Freight's LTL subsidiary, and Old Dominion attempted

to impose fuel surcharges.  Id. ¶ 63.  After mid-2003, however, Plaintiffs assert the Defendants presented a "unified front" on fuel surcharges, thus leaving consumers with effectively no choice but to pay the surcharges.  Plaintiffs assert the Defendants were able to set fuel surcharges commonly because each of them posts current and possibly future fuel surcharges on their respective websites.  Id. ¶ 65. Plaintiffs do not assert any factual allegations to show that the Defendants, following some conspiratorial agreement, presented a "unified front."

What the alleged facts actually show is that as of May 2007, nine of the Defendants set fuel surcharges as a percentage of base freight rates, indexed to the cost of diesel fuel as published by the United States Department of Energy.  Id. ¶ 67 and Chart.  At the $2.80 per gallon price, for instance, nine Defendants each charged a fuel surcharge exceeding 18% of the base rate and within 0.5% of each other.  There is comparable confluence of fuel surcharge rates at other diesel price points.  Id.  Plaintiffs allege these rates were published on the Defendants' websites, facilitating communication of their price movements among each other. Id.  From these facts, Plaintiffs make the broad conclusory allegation that, "Defendants agreed to impose identical or nearly identical fuel surcharges by agreeing to tie fuel surcharges to a publicly available index of diesel fuel prices

('Fuel Index') published by the United States Department of Energy ('DOE')."
Id.[9]  Put another way, Plaintiffs do not allege facts to suggest these were enacted in
concert or whether each was responding consistently to another's fuel surcharge.

Plaintiffs also assert that the Defendants' high profits during the Class
Period support an inference of conspiracy.  Plaintiffs note purported statements of
the Defendants to the effect that while fuel costs increased during the Class Period,
the fuel surcharges imposed more than offset those costs.  Id. ¶ 71.  If diesel fuel
were to have increased 50% from $2.00 to $3.00 in May 2007, for instance, the
fuel surcharge for most Defendants would have nearly doubled from 10.9% to
20.9%.  Plaintiffs assert that through this pricing scheme several of the Defendants
experienced substantial growth in revenue and profits during the Class Period.  Id.
¶¶ 80-81.  If gas prices were to decline, several Defendants warned of decreased
overall revenue due to lower fuel surcharges.  Id. ¶¶ 82-88.  Plaintiffs infer from

---

[9]  While the Plaintiffs argue the Defendants conspired beginning in 2003, the
facts alleged do not support this conclusion.  The facts alleged are that several of
the LTL carriers began asserting fuel surcharges in 1999.  By 2007, the
Defendants' fuel surcharges had reach a point by which they were nearly identical
in methodology and amount.  Plaintiffs offer no factual explanation for what
occurred in the intervening eight years.  To the extent the Plaintiffs allege an
agreement, they do not allege facts to show when it began and when each
Defendant allegedly joined into it.  They simply do not let the Defendants know
where to begin.  In re Se Milk Antitrust Litig., 555 F. Supp. 2d at 942.

the Defendants' alleged profitability, "that the LTL fuel surcharge programs were the product of concerted action because in a genuinely competitive environment, carriers and shippers alike would share the effects of fuel cost increases." Id. ¶ 81.

Finally, Plaintiffs point to two mechanisms through which the Defendants could have communicated and agreed to set LTL fuel surcharge prices. Defendants are alleged to have published fuel surcharge rates contemporaneously on their respective websites. Id. ¶ 67. Plaintiffs allege this facilitated the conspiracy. Id. Plaintiffs also allege that eight of the Defendants were members of the NMFTA, which held four to six annual meetings per year in 2003 through 2007. Defendants are also alleged to be members of the ATA, which held "regular meetings" during the Class Period. Id. ¶ 130. Plaintiffs allege, without further support, that the Defendants' participation in these meetings spanning over four years gave them the "means and opportunity" to establish and enforce a conspiracy to assess fuel surcharges. Id. ¶ 97. Interestingly, there is no allegation that the Defendants attended the meetings, or that the Defendants had any other communications through which they might have established an agreement.

**b.**     **Analysis**

Plaintiffs' allegations establish a factual context suggesting "parallel conduct that could just as well be independent action."  Twombly, 127 S. Ct. at 1966. Plaintiffs' allegations make clear that the few LTL Defendants controlled in excess of 75% of the total United States LTL market, in contrast to the TL market, which is allegedly dominated by thousands of small and middle-sized firms.  Am. Compl. ¶ 49.  The Amended Complaint alleges that the LTL market is unique and structurally cohesive and that LTL services are interchangeable and fungible.  LTL services are essentially homogeneous, and the only reason for a consumer to discriminate between LTL carriers is price competition.  LTL demand is inelastic, and LTL services are highly concentrated as a result of mergers, acquisitions, and consolidation among existing LTL carriers since 1990.  Substantial barriers to entry prevent new players from entering the LTL market (and presumably inhibit change from outside the industry).  The LTL industry is mature, has slim profit margins, a high ratio of fixed costs to variable costs, and is generally cooperative among the LTL carriers.  All Defendants have similar cost structures, and none of the Defendants is significantly more efficient than any other.  All Defendants publish shipping rates on their websites (available publicly), and all Defendants

use identical pricing software when computing their shipping rates.  <u>See generally</u>

Am. Compl. ¶ 51.

The consequence of these allegations – and the market homogenation that

they describe – is that the LTL market appears to be one in which all players are

operating from essentially the same information at the same time charging the

same rates.  None is significantly more profitable than any other, and all LTL

carriers allegedly utilize the same cost and profit structure.  All carriers would be

equally impacted by market variables, such as fuel costs, labor costs, taxes, and

unanticipated costs such as natural disasters and weather delays.  Each LTL carrier

would have the same incentive, at the same time, to adjust its shipping rates,

including its surcharges, to accommodate the change in market variables.

Considering the high ratio of fixed to variable costs, each LTL carrier would have

the same incentive to reduce variable costs as much as possible, and thus increase

profit margins.

The consolidated complaint alleges a historical basis for fuel surcharges.

The Defendants allegedly assessed fuel surcharges for several decades before the

Class Period.  <u>Id.</u> ¶ 59.  Plaintiffs allege those early surcharges varied by carrier to

carrier.  <u>Id.</u> ¶ 60.  In July and August 1999, however, Defendants ABF, Roadway

Express, Inc., YRC, FedEx Freight, and Old Dominion all attempted to assess fuel surcharges, with varied success.  Id. ¶ 63.  Plaintiffs allege that the Defendants presented a "unified front" on fuel surcharges beginning in the Class Period, however Plaintiffs do not allege any facts in the consolidated complaint regarding what the Defendants' fuel surcharges actually were as of July 2003.  The earliest, and indeed only, factual allegation of the fuel surcharges for each Defendant is not until May 2007.  Id. ¶ 67.  On July 23, 2007, less than three months after the data shown in the consolidated complaint, defendant FedEx allegedly "broke the conspiracy" and reduced its fuel surcharges by 25%.  Id. ¶ 78.  These allegations suggest the absence of a conspiracy, not the presence of one.

A comparison of these factual allegations to the price of diesel fuel for the time periods alleged provides insight into why the LTL carriers may have felt fuel surcharges were necessary.  See Defs.' Exh. A (attached to Request for Judicial Notice).  From March 1994 to November 1999, the average price per gallon of U.S. No. 2 Diesel for all sellers ranged between $0.959 and $1.323 – or approximately $0.36.  With the exception of outlier months such as October 1996, prices generally ranged from $1.00 to $1.20.  During this time period Plaintiffs

allege essentially no significant fuel surcharge activity, except "intermittent" charges.

From December 1999 to June 2003, fuel prices appreciably rose from the prior years. Diesel fuel prices ranged from $1.15175 to $1.708 – a range of over $0.65, or market fluctuations of nearly 50%. During this time Plaintiffs allege six of the major LTL carrier Defendants began assessing fuel surcharges.

From July 2003 to the present, approximately the Class Period, diesel fuel prices have ranged from $1.435 (July 2003) to $4.425 (May 2008) – a range of nearly $3.00, representing a nearly 200% variation in diesel fuel costs. Defendants' Exhibit A shows that fuel prices per gallon have risen almost without exception in each month from July 2003 to May 2008.

These historical fuel price figures show a clear correlation between the Defendants' activities in assessing fuel surcharges and the increasing price of diesel fuel. When fuel prices were low and relatively static, the Defendants assessed fuel surcharges only intermittently. In 1999, when fuel prices and fuel price fluctuations began to rise, several of the Defendants began assessing fuel surcharges to recoup the increased variable costs. In July 2003, the beginning of the Class Period, diesel fuel prices began a steady and discernable pattern of

increased prices, rising by nearly 200% in five years.  The Complaint alleges that by May 2007 the Defendants had all reached homogeneous fuel surcharge levels.

It is quite plausible, therefore, that the Defendants imposed fuel surcharges as a direct, and immediate, reaction to relatively high fuel costs and relatively high fluctuations in fuel cost.  Given the homogeneous and closed market for LTL services, it also is plausible that each carrier was facing approximately the same dilemma when rising fuel costs substantially raised their otherwise low variable costs.  Since fixed costs and profits margins are alleged to be comparable across all LTL carriers, it is highly plausible that each carrier faced a similar profit shortfall as a result of the increased fuel prices.  It also is plausible that each carrier required a similar fuel surcharge to recoup the profits lost due to increased fuel costs.  In sum, the consolidated complaint plus historical data show that it is plausible that the Defendants' assessment of fuel surcharges was directly the result of increased price of diesel fuel, not an anticompetitive conspiracy.

Plaintiffs make three primary arguments against dismissal.  Plaintiffs argue that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors" should be sufficient to nudge allegations of parallel conduct past the plausibility threshold.  <u>Twombly</u>, 127 S. Ct.

at 1965 n.4.  However, the Defendants' fuel surcharges are not alleged to be either

historically unprecedented or enacted at the same time.  Defendants are alleged to

have used fuel surcharges for decades, and six major LTL carriers are alleged to

have assessed fuel surcharges beginning in 1999, when diesel prices began to rise

above early 1990s levels.  Plaintiffs do not adequately allege that all the

Defendants assessed similar fuel surcharges at "exactly the same time."  At best,

Plaintiffs allege, "[a]fter mid-2003, however, Defendant LTL carriers presented a

unified front on fuel surcharges . . . ."  Am. Compl. ¶ 63.  This vague allegation is

not specific enough to plausibly infer a conspiracy.  The only factual data

presented is as of May 2007, four years into the Class Period.

The consolidated complaint also does not state a time frame of agreement

with sufficient particularity for to allow the Court plausibly to infer conspiracy.

Even assuming the Defendants used the Internet and meetings through NMFTA

and ATA to discuss anticompetitive agreements, the time period alleged – from

2003 to 2007 – is far too broad for the Court to infer an agreement.  In several

other cases in which courts inferred agreement based on parallel price changes, the

plaintiffs were able to allege agreement in a defined and narrow date or date

window.  See Twombly, 127 S. Ct. at 1970 n.10; In re OSB Antitrust Litigation,

-44-

2007 WL 2253419, at *3 (agreement on or about June 1, 2002); <u>City of</u>

<u>Moundridge</u>, 250 F.R.D. at 4 (plaintiffs' complaint adequately "identifie[d] the

years and locations where the agreement was reached and the defendants who

participated."); <u>In re Graphics Processing Units Antitrust Litig.</u>, 540 F. Supp. 2d at

1091-95; <u>In re Rail Freight Fuel Surcharge Antitrust Litig.</u>, No. 1:07-mc-00489-

PLF, at 9 (D.D.C. Nov. 7, 2008).

Plaintiffs also argue that the Defendants could not have arrived at the same

fuel surcharge methodology and levels without agreement.  Plaintiffs overlook that

the structural characteristics alleged in the consolidated complaint would have

motivated the LTL carriers to each set exactly the same fuel surcharges.  Each

carrier allegedly shares the same business model, cost and profit structure, and

ratio of fixed to variable costs as all others.  If, as alleged in the consolidated

complaint, several of the major LTL carriers began imposing fuel surcharges from

1999 to 2003 and posted those fuel surcharges on the Internet, it is quite plausible

that other carriers, facing the same costs and lost profits, would begin to assess the

same surcharges.  One LTL carrier would generally not have a financial incentive

to charge less for fuel than all other carriers when the market will by its structure

bear whatever fuel surcharges are assessed by other carriers in a market of fungible services and inelastic demand.

Plaintiffs final argument relies on the Defendants' allegedly high profit margins during the Class Period.  Increased profits in a concentrated industry, absent evidence of an agreement to artificially inflate profits, does not alone state an antitrust claim.  Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227 (1993) ("Tacit collusion, sometimes called oligopolistic price coordination or conscious parallelism, describes the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions."); Williamson Oil Co., 346 F.3d at 1299.  This aphorism is even more true in a market such as the LTL industry, where profit margins historically are small and the market is largely homogeneous.  As one LTL competitor raises prices and improves its profits, the other competitors have a natural incentive to do the same, comfortable in the knowledge that demand for LTL services will not drop appreciably as a result.  The same tenet provides that the Defendants' use of fuel surcharges as a profit generator also does not show anticompetitive behavior.

The Defendants are entitled to generate profits on fuel surcharges by charging more than their incremental increase in fuel costs, so long as the Defendants do not illegally conspire to do so.  In a homogeneous industry each major player has the same incentive to charge the same surcharge and realize the same improved profit margin.  These circumstances do not indicate anticompetitiveness, they indicate a close and competitive industry.

    In sum, Plaintiffs' allegations do not show enough facts for the Court to find that agreement was plausible.  What the allegations show instead is that all LTL service providers had the same incentives to charge the same shipping rates, and that over time they eventually each did so.  Without more-specific allegations of an agreement, such as historical fuel surcharges showing coordinated pricing decisions within a limited defined date range, and not caused by common individual reactions to sharp fuel price increases, the Court cannot find that an agreement was the plausible reason for the Defendants' decisions.  The Court must be mindful in cases such as this to require plausibility before subjecting the Defendants to what will surely be an expensive and burdensome discovery process.  Plaintiffs must show that an agreement is the plausible reason for pricing decisions,

not an unintentional but common set of individual reactions to external stimuli. Plaintiffs have not made this showing.[10]

The Court will allow the Plaintiffs an opportunity to amend their Consolidated Amended Complaint.  Generally, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."  Foman v. Davis, 371 U.S. 178, 182 (1962); accord Bryant v. Dupree, 252 F.3d 1161, 1163 (11th Cir. 2001) ("Generally, where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice.") (internal quotation marks omitted).  The current consolidated amended complaint is dismissed without prejudice to the Plaintiffs' ability to file a motion to amend the consolidated amended complaint.  Plaintiffs' motion to amend, if any, must be filed on or before March 16, 2009.  In filing Plaintiffs' motion to amend, Plaintiffs shall contemporaneously file, with their proposed amended complaint, a separate copy

---

[10]  The Court commends counsel for their advocacy of the issues presented in this motion.  Counsel for the Class and the Defendants have each done a remarkable job in distilling complex and important issues into concise briefing. The fairness and effectiveness of the advocacy is appreciated by the Court and is an increasingly rare commodity.

of the proposed amended complaint on which Plaintiffs shall red-line the changes to the amended complaint filed on May 23, 2008, clearly showing the differences between the proposed revised amended complaint and the Consolidated Amended Class Action Complaint considered herein.

## III.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint [246] is **GRANTED**.  The Defendants' request for judicial notice is **GRANTED** as to Exhibit A and **DENIED** as to Exhibits B through L.

**IT IS HEREBY FURTHER ORDERED** that this action is **DISMISSED WITHOUT PREJUDICE**.  Plaintiffs shall be permitted to file a motion to amend the consolidated complaint on or before **March 16, 2009**, in accordance with the terms of this Order.

**SO ORDERED** this 28th day of January 2009.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE